| 15 | 75 |
|----|-----|
| 91 | 607 |

## STATE, ex rel. STATE BANK, vs. HASTINGS.

Salary of an officer, to become due, is a possibility coupled with an interest, and as such capable of being assigned.

A circuit judge delivered to the Iowa County Bank, on the 3d of August, his order upon the treasurer of state, directing him to pay to said bank or *order*, on the 1st of October following, a certain sum "in full for my (his) quarter's salary commencing on that day," the order being drawn *without value* and intended by the parties as a mere authority to the bank to receive and hold the money for the judge's use. The Iowa County Bank indorsed the order, for full value, before maturity, to the State Bank, which purchased it without any notice of the rights of the drawer, except such as is to be implied from the order itself. *Held*, that the drawer, after having, by proper documentary evidence of title, clothed the Iowa County Bank with the apparent ownership of the fund, is estopped as to *bona fide* purchasers for value, from asserting that such apparent ownership was not the real ownership. PAINE, J., dissented.

It was not necessary that the *order* should have been audited by the secretary of state before the state treasurer was authorized to pay it. It is enough that the quarter's salary was allowed and certified by him to the treasurer.

The state treasurer having refused to pay said order, on the ground that its payment was countermanded by the circuit judge, the court awarded a *mandamus* to compel its payment, it appearing that he had sufficient funds in his hands applicable to that purpose.

January Term,
1862.

STATE BANK
v.
HASTINGS.

MANDAMUS. The alternative writ stated that the order drawn by Judge Cothren in favor of the Iowa County Bank, was given for a valuable consideration received of the bank. The other allegations of the writ are stated in the opinion. The defendant moved to quash the writ.

March 15.

*By the Court*, COLE, J. This is a motion to quash an alternative writ of *mandamus*. The substance of the relation is, that Judge M. M. Cothren, on the 3d day of August, 1861, executed and delivered to the Iowa County Bank the following instrument: "$625. Mineral Point, August 3, '61. On the first day of October next, pay the Iowa County Bank or order, six hundred and twenty five dollars, in full for my quarter's salary commencing on that day, and oblige M. M. COTHREN. To S. D. HASTINGS, State Treasurer of Wisconsin:" and that the Iowa County Bank, for value, indorsed and delivered the same to the relator, *The State Bank.* The relation states that the quarter's salary of Judge Cothren became due on the 1st of October last, and was certified by the secretary of state to the respondent, the state treasurer; that the same remains unpaid, and that the respondent has neglected and refused to pay the amount thereof to the *State Bank*, though he has sufficient funds in his hands applicable to that purpose. The writ is issued to compel the state treasurer to pay to the *State Bank* the sum of six hundred and twenty five dollars. It is admitted that the state treasurer refused to pay the sum to the *State Bank* on the instrument above described, for the reason that Judge Cothren wrote him a letter previous to the first day of October last, forbidding its payment.

The single question arising upon the motion is : Does the relation state such facts as show that the *State Bank* is entitled to the amount of money, and to a writ of *mandamus* to compel the respondent to pay it over on the order ?

It is conceded on both sides that the order is not in the nature of a bill of exchange, and that the legal incidents of negotiable paper do not belong to it. The order is drawn upon a particular fund, and its payment depended upon such

contingencies as to deprive it of that character.    What then
is the nature and effect of the order?

In support of the motion it is argued that the instrument
is merely a written authority given to the Iowa County
Bank to draw for Judge Cothren his quarter's salary falling
due on the 1st of October, 1861, with the power of substitu-
tion, but that this authority was revocable at pleasure, and
did not operate as an assignment to the holder, of the particu-
lar fund upon which it was drawn.    We deem this an erro-
neous view of the nature and effect of the order.    We think
it was an assignment by Judge Cothren of the quarter's salary
in question to the Iowa County Bank, and that the money
became payable to such bank, or to its order, according to
the terms of the instrument.    This position is fully sustained
by the cases to which we were referred on the argument by
the counsel resisting the motion to quash, as well as the fol-
lowing additional authorities: *Morton vs. Naylor*, 1 Hill, 583 ;
*Peyton vs. Hallett*, 1 Caines, 363; *McLellan vs. Walker*, 26
Maine, 114; *Legro vs. Staples*, 16 Maine, 252 ; *Nesmith vs.
Drum*, 8 W. & S., 9 ; *Blin vs. Pierce*, 20 Vermont, 25;
*Brooks vs. Hatch*, 6 Leigh, 534; *Mullhall vs. Quinn*, 1 Gray,
105; *Hartley vs. Tapley*, 2 id., 565 ; *Taylor vs. Lynch*, 5
id., 49; *Lannan vs. Smith*, 7 id., 150.    The quarter's salary
of Judge Cothren which became due on the 1st of October,
1861, was a possibility coupled with an interest, and as such
capable of being assigned.    *Brackett vs. Blake*, 7 Met., 335.
Chancellor KENT says, that it is sufficient that the thing con-
tracted for has a potential existence, and that a single hope
or expectation of means founded on a right *in esse*, may be
the object of sale, as the next cast of the fisherman's net, or
fruits or animals not yet in existence, or the good will of a
trade.    2 Kent, Lecture 39, page 602, 8th ed.    The future
earnings of a party to a contract may be assigned (*Hartley vs.
Tapley* ; *Taylor vs. Lynch*; *Lannan vs. Smith, supra*); or rents
to become due (*Morton vs. Naylor, supra*); while in *Brackett
vs. Blake* and *Mulhall vs. Quinn*, the court say :  "If a party
is under an engagement for a term of time, to which a sala-
ry is affixed, payable quarterly, especially if he has entered

upon the duties of his office, although at any time liable to be removed, he has an interest which may be assigned."

We cannot see why this doctrine is not strictly applicable to the case at bar. It is true we were referred to some English cases, which held that the assignment of the pay of officers in the public service, judges' salaries, pensions, &c., was void, as being against public policy; but it was not contended that the doctrine of those cases was applicable to the condition of society, or to the principles of law or of public policy in this country. For certainly we can see no possible objection to permitting a judge to assign his salary before it becomes due, if he can find any person willing to take the risk of his living and being entitled to it when it becomes payable.

Assuming that the instrument operated as an assignment of the salary to the Iowa County Bank or its assignee, still it is insisted the writ should be quashed on several grounds.

First, it is said the order should be presented to the secretary of state, to be audited and allowed. This we deem unnecessary. The quarter's salary due Judge Cothren on the 1st of October, 1861, was undoubtedly audited—if such a ceremony can be necessary—and certified to the treasurer as stated in the relation. This is the invariable practice of the state auditor. The order merely showed that this quarter's salary belonged to the *State Bank*. And this order was undoubtedly all the voucher or receipt which the treasurer might require, to show that he had paid the quarter's salary to the person to whom Judge Cothren had sold and assigned it, and who was authorized by Judge Cothren to receive the same.

Again, it is said that the proceeding by *mandamus* is peculiar, and that the writ will not lie when the party applying for it has any other adequate remedy. This is undoubtedly a correct proposition of law. But what remedy has the *State Bank* against the respondent? It is his duty to pay over money on appropriations to the party entitled to the same. He would probably have paid over to the *State Bank* the quarter's salary on this order, had he not been forbidden by Judge Cothren to do so. Still we hold that

Judge Cothren has no right to stop the payment of the salary, having sold and transferred his interest in the fund to another. It then becomes the duty of the treasurer to pay it to the *State Bank*. It would not be contended that the treasurer would not be compelled by *mandamus* to pay the salary to Judge Cothren, had he not assigned it. Why then should he not be required by the same proceeding to pay the fund to the person whom Judge Cothren has clothed with his rights over it and authorized to receive it?

The motion to quash the writ must be denied.

If the respondent desires to put in an answer, he can do so by filing the same within twenty days.

An answer or return was afterward filed, which alleged, among other things, that the order in question was delivered to the Iowa County Bank by Judge Cothren without any consideration, and upon an express verbal agreement that the bank was to act as his agent in receiving the money when it became due, and to pay it over to him; and that he did not, at the time of signing and delivering the order, or at any other time, authorize said bank to indorse, sell, transfer, hypothecate or in any way dispose of the same to any person or for any purpose whatever. The relator demurred to the return.

*Abbott, Gregory & Pinney*, for the demurrer:

The court has already decided that the order was an assignment of the quarter's salary to the Iowa County Bank or its assignee. The legal effect of that instrument cannot be varied by parol evidence, even as between the Iowa County Bank and Judge Cothren. 7 Wis., 532; 1 Hill, 116; 1 Denio, 400; 1 Cow., 349; 4 Wis., 369. The instrument is not a bill of exchange, but the words "or order" must be construed so as to have some legal effect. We insist that they import, if the question is one of agency merely, a right on the part of the Iowa County Bank to sell and dispose of the quarter's salary. What else could the *State Bank* suppose they meant? Where a loss is to be sustained from the misconduct of a third party, he who selected and trusted such party must bear the loss. *Farmers' & M. Bank*

January Term, 1862.

STATE BANK v. HASTINGS.

vs. *Butchers' & Dr. Bank*, 16 N. Y., 125; 4 Kern., 623; 1 Story's Eq., 387. Judge C. selected the Iowa County Bank as his agent, and furnished it with the most complete evidence that it had a right to dispose of the quarter's salary; and he is now estopped from saying that it had instructions at variance with the power which the written instrument imports. Note of Prof. Dwight to the case of *Gould vs. The Town of Sterling*, Am. Law Reg. for March, 1862, p. 297; *Mallory vs. Mariner*, decided June Term, 1862, of this court.

*J. H. Knowlton*, contra:

The order was *non-negotiable*, and whoever takes such paper, takes subject to all equities between the maker and the first holder, even when a consideration is expressed on the face of the paper; *a fortiori* is this so when the instrument expresses no consideration. Contracts unsealed and non-negotiable must have a consideration to uphold them. 4 Johns., 235; 9 Cow., 779, 780; 7 Cow., 57; 5 Mass., 301; 1 Stewart, 51; 4 Munf., 95; 11 Vt., 166; 4 Shep., 458. Even in bills of exchange and promissory notes, there must be a consideration as between the immediate parties. 5 B. & C., 503; 8 D. & R., 165; Bayley on Bills (5 Ed.), 499; Chitty on Bills (8 Ed.), 79–90; Roscoe, 111, 123; Chitty on Contracts (5 Am. Ed.), 27, 28; 4 Shep., 394. Had the order contained the words "for value received," it would have been a valid assignment *on its face*. But where an unsealed, non-negotiable instrument is silent as to a consideration, the purchaser must see, at his peril, that there is a consideration which will support it. An assignee of such a paper can get no greater right than his assignor had. The fact that no consideration is stated, is a most suspicious fact, and full notice to every assignee that the paper is void unless a consideration can be shown. As between Judge Cothren and the Iowa County Bank, the latter could not have drawn the money from the treasurer after payment was countermanded. Anything that would have been a good return to the writ if that bank were the relator, is good against the present relator, as it could get no greater right than its assignor had. Had the Iowa County Bank collected the quarter's

salary, the money would have belonged to Judge Cothren. January Term
The same is true had the money been collected by the pres- __1862.__
ent relator.  2. If the order is negotiable, or if, being non- STATE BANK
negotiable, it was in fact supported by a valid consideration, v.
then Judge Cothren is liable to an action, in the one case as HASTINGS.
drawer, in the other for wrongfully forbidding its payment,
and therefore a *mandamus* will not lie.

*By the Court*, DIXON, C. J.  It was decided on a former Dec. 16, 1862.
occasion that the order "was an assignment by Judge Coth-
ren of the quarter's salary in question to the Iowa County
Bank, and that the money became payable to such bank or its
order, according to the terms of the instrument." That decis-
ion was of course made with reference to the facts as they
then appeared, one of which was that the order was given
for a valuable consideration received by the judge of the
Iowa County Bank.  This was averred in the relation and
admitted by the motion.  Now, however, the case is in that
respect reversed.  It is admitted that the judge received no
consideration.  The averment of the relation is denied by
the return.  The respondent furthermore alleges not only that
the order was drawn without value, but that it was in-
tended by the parties as a mere authority to the bank to
receive and hold money for the judge's use.  To this return
there is a demurrer, and the question is, Who, under these cir-
cumstances, is entitled to the money, the relator or Judge
Cothren?  The actual good faith of the relator is not denied.
It is conceded that it purchased and paid full value for the
order, without notice of the judges's rights, except such as is to
be implied from the order itself.  It will be seen at once that
this is a very different question from that heretofore present-
ed—so different, indeed, as scarcely to be influenced by the
considerations which then led to our decision.  Upon the sup-
position that the judge drew the order for value, then there
could be no controversy as to the equitable or even the legal
rights of the parties.  They were wholly on the side of the
relator, and not at all on the side of the judge.  But now,
viewed from the same stand point, they hang "in even scale,"
or so nearly so that we can with difficulty determine in

whose favor the beam is inclined. Indeed, I must say, were we to stop with the principles by which we were then governed, and to decide the case solely upon the effect to be given to the order as an assignment or conveyance in fact from Judge Cothren to the Iowa County Bank, I think we should arrive at directly the opposite conclusion. Within all the authorities, upon the facts stated in the return, there was no assignment as between the judge and the Iowa County Bank. In an action between him and that bank, he could come in with parol evidence and show that there was no consideration, and thus turn the apparent assignment into a mere authority. The decisions are numerous and uniform that between the original parties and those not protected by the operation of some other principle, such orders are not absolute but only *prima facie* or constructive assignments—presumed to be such until it be shown by extrinsic evidence that they were designed as a mere authority, which may be by proof of want of consideration or other circumstances inconsistent with the supposition that a transfer was intended. How far this doctrine is encountered by the rule which forbids the introduction of parol evidence to change the legal construction and meaning of written instruments, or whether it can be harmonized at all with that rule, I need not inquire. It is enough that it is established by a long line of adjudications in several of the states, especially in Massachusetts. Looking then to actual title, and that alone, and holding that the relator must trace it through the Iowa County Bank, it is obvious there can be no recovery in this proceeding.

If, therefore, the claim of the relator is to be sustained, it must be upon some other ground than that of assignment *in fact* from the judge to the Iowa County Bank. And the question is, whether there is any such ground upon which it can be rationally placed. I think there is, and that it is one which gives a most just and decided preponderance in favor of such claim. It is that of estoppel—that the judge, after having, by proper *documentary evidence of title*, clothed the Iowa County Bank with the apparent ownership of the fund, is estopped, as to *bona fide* purchasers for value, from asserting that such apparent ownership was not the real ownership.

Having voluntarily entrusted the bank with written evidence of title, he is bound by the disposition it made of the property, upon the obviously just principle, that when one of two parties must suffer from an unauthorized act, the loss should fall upon that one who has enabled the guilty agent to perpetrate the fraud, and not upon the other, who has acted in good faith and with proper caution.

In *In Pickering vs. Busk*, 15 East, 38, the owner of hemp lying at wharfs in London at the time of purchase, had it transferred in the wharfinger's books into the name of the broker who effected the purchase for him, and whose ordinary business it was to buy and sell hemp. The broker, without authority from the owner, sold the hemp to a purchaser for value, not having notice of the want of title. In trover by the owner against the assignees of the purchaser, it was held that the title was in the latter. The decision was put upon the ground that the broker had an implied authority to sell. Lord ELLENBOROUGH, C. J., said : "Strangers can only look to the acts of the parties and to the external indicia of property, and not to the private communications which may pass between the principal and his broker; and if a person authorize another to assume the apparent right of disposing of property in the ordinary course of trade, it must be presumed that the apparent authority is the real authority." I think the same doctrine applicable here, and fully decisive of the rights of the parties, and that whether we regard the order as a *prima facie* assignment of the quarter's salary or an authority to the bank to receive it. If an authority, then I think it must be construed as an authority not only to receive, but in the mean time to dispose of the fund by a transfer of the order in the form of an indorsement. Otherwise I can give no effect to the words "or order." They seem to me to be wholly inconsistent with the idea of mere substitution, or that the money collected was to come back into the hands of the Iowa County Bank to be held for the use of the judge. On the other hand they appear clearly to have been used to give the instrument, so far as might be, the character of negotiable paper; at all events, to signify that it was assignable, and the fund subject to transfer at the

option of the payee. This, being the natural import, should be the legal construction of the language employed. It should admit of no explanation incompatible with the interest of third persons who have acted in good faith upon it. As to them, the instrument should be fixed and irrevocable as it appears, and not subject to limitation by the actual authority of the payee, the extent of which is subsequently to be ascertained by the fact.

But it is not by the instrument as an authority that I choose to test the rights of the parties. I prefer rather to treat it, according to the decisions, as a *prima facie* assignment. As such, upon the principles already stated, I can feel little doubt as to the proper solution of the question. Understanding the expression, "*prima facie*" to be equivalent in signification to the word "apparent" as used by Lord ELLENBOROUGH, I say with that learned judge, that I cannot subscribe to the doctrine, that the engagements of the assignee named in such instrument are necessarily and in all cases limited to his actual interest, the reality of which is afterwards to be tried by the fact; but that he may bind the assignor or maker within the limits of his *apparent* ownership; and that there would be no safety in mercantile transactions if he could not. It was a part of the business of the Iowa County Bank, in common with all similar institutions, to buy, sell, and deal in funds and evidences of debt of various kinds; and when intrusted with them under written evidence of title given by the owner, it must be presumed that a transfer was intended, or at least that the bank was authorized to sell. Between the owner of the hemp and the broker, the evidence afforded by the entry in the wharfinger's books was open to explanation and disproof; but as there the apparent authority became real, when the rights of a purchaser in good faith intervened, so here the *prima facie* assignment becomes conclusive under like circumstances.

"Or I should have left it to the jury to say, whether the plaintiffs had, by their own conduct, enabled Smith (the agent) to hold himself forth to the world as having not the possession only, but the property; for if the real owner of goods suffer another to have possession of his property and

of those documents which are the indicia of property, then perhaps a sale by such a person would bind the true owner." ABBOTT, C. J., in *Dyer v. Pearson*, 3 Barn. & Cress., 38 (10 E. C. L., 15). See also *Davis v. Bradley*, 24 Vermont, 55.

It is impossible for me to discriminate between the effect, as an estoppel, of executing and putting in circulation an instrument like that under consideration, and the effect which is given to many other acts *in pais*, by which a man is excluded from asserting the truth. If for instance Judge Cothren, being present, had verbally represented to the relator that the Iowa County Bank was the owner of the fund, and the relator had purchased relying upon such representation; or if, under like circumstances, he had merely remained silent while the sale was being made, there can be no doubt that he would afterwards have been concluded by his representation or conduct, although contrary to the truth. According to the interpretation given by law, the order in question was a continuing representation, to whomsoever it was offered for negotiation and sale, that the quarter's salary belonged to the Iowa County Bank, and the judge should be bound by whatever disposition was made of it by the bank. "There is, I think, no distinction in principle, although the party who enables another to assume the credit of ownership, may not be actually present when the act is done by which the third party is deceived." *Thompson v. Blanchard*, 4 Coms., 310. Cases are numerous in which parties have been held estopped by their written statements acted on in good faith. *Wickoff v. True*, Clarke's Ch. R., 237; *Holmes v. Williams*, 10 Paige, 336; *Chamberlain v. Townsend*, 26 Barb., 611; *Mechanics' Bank of Brooklyn v. Townsend*, 29 Barb., 569.

"The truth is," says the annotator (*Doe v. Oliver—Duchess of Kingston's Case*), 2 Smith's Lead. Cas., 620, "that the courts have been for some time favorable to the utility of the doctrine of estoppel, hostile to its technicality. Perceiving how essential it is to the quick and easy transaction of business, that one man should be able to put faith in the conduct and representations of his fellow, they have inclined to hold such conduct and such representations binding in cases

where a mischief or injustice would be caused by treating their effect as revocable."

The foregoing observations render particular comment upon the positions of the respondent's counsel unnecessary. It is a matter of no importance that the instrument was not negotiable within the law merchant. It is not as a chose in action, or contract to be performed in the future, but as a present executed transfer, that we are to regard it.

Neither is it material that no consideration was expressed on the face of it. *Prima facie*, such an order is evidence of a consideration, without the words "value received," or other express evidence of consideration, so as to constitute a good assignment. *Adams v. Robinson*, 1 Pick., 460; *Bourne v. Cabot*, 3 Metcalf, 305.

In my judgment the demurrer should be sustained.

Mr. Justice COLE concurring: Ordered accordingly.

PAINE, J.   I am unable to concur in the opinion of the court sustaining the demurrer to the return. It is fully admitted in that opinion, that the question now presented is entirely different from that previously decided on the motion to quash the alternative writ. That motion was equivalent to a demurrer to the relation, and admitted the allegation that the order in question was given by Judge Cothren to the Iowa County Bank for a valuable consideration. Upon that state of facts we held, as the law undoubtedly is, that it would operate as an equitable assignment of the fund for which it was drawn. But the return now avers that no consideration was paid by the Iowa County Bank for the order, but that it was given as a mere authority to that bank to collect the money as the agent of Judge Cothren and pay it over to him. It is conceded that the paper was not negotiable; it is conceded in the opinion of the court, that upon the facts stated in the return, and which are now assumed to be true, it was not an assignment of the fund either legal or equitable. Yet the court hold that an agent holding an authority of this kind, not negotiable and giving him no title to the fund, may transfer a perfect right to any one who

chooses to purchase the paper of him for value, without notice of any thing farther than what appears on its face.

If such a conclusion can be sustained at all, it is clear that it can be done only on the ground on which it is placed by the court, that the drawer is estopped from setting up the real truth as against such purchaser.

Why should he be estopped ? It is said, because he has entrusted the holder of the order with a *prima facie* assignment of the fund, and therefore should not be allowed to deny that he had the real title as against purchasers in good faith. I admit there are many cases speaking of such orders as *prima facie* assignments. And the expression, though not entirely accurate, is sufficiently so for ordinary purposes. They mean nothing more than that they are *prima facie* evidence of an assignment. For it is certain that such an order does not purport to be an assignment. The instrument is equally as consistent with the fact that there was only a mere authority to receive, as agent, as with the fact that there was a sale of the fund drawn on. And it is for this reason that the law, although, for the sake of having a certain rule as to its first effect as evidence, it has been said that such an order shall be sufficient *prima facie* to show an assignment, still allows this inference to be rebutted, and on proof that it was not given for value holds it to be no assignment, but a mere authority. If the instrument were a proper assignment in itself, this could not be done without violating the rule that the writing could not be contradicted. Such a rule would then be clearly liable to the criticism suggested in the opinion of the court. But when the law has prescribed that an instrument which, by its terms, is equally as consistent with one state of facts as with another, should be *prima facie* evidence of one, that certainly cannot be held to give the writing such an absolute character that to allow the other state of facts to be shown would be to contradict it. I think, therefore, it is entirely consistent for the law to give to such an order, which does not purport to show the real contract between the parties, a *prima facie* effect as evidence of what that contract was, and still allow that inference to be rebutted by extrinsic evidence that the real transaction was different,

and that this is no violation of the rule prohibiting a written contract from being contradicted or varied by parol, for the reason that such an order does not purport to show the contract, and is as consistent with the one state of facts as with the other.

Still, whether it would violate that or not, the court concedes that the law is established, as stated by Chief Justice SHAW, in *Bourne vs. Cabot*, 3 Met., 307, "that being *prima facie* only, it is always competent to rebut the presumption of consideration by proof, in which case such order should be construed to be an authority only, without interest in the payee, and so not an assignment." The question then is, whether one who entrusts another with *prima facie* evidence of title to his property, is estopped from showing that such other had no title as against any one choosing to purchase from such other on the strength of that *prima facie* evidence. That he is so estopped certainly cannot be asserted as a general proposition. For if it were so, then any one who entrusted another with the possession of his property, might lose it through an unauthorized sale by the bailee. For possession is *prima facie* evidence of ownership, and I am wholly unable to see why the same argument urged in the opinion of the court in favor of an estoppel in this case, might not as well be urged in every such case. For if one purchaser has the right to buy on *prima facie* evidence of title, and then insist on an estoppel, why not another? The same argument is true in each case, that the owner has entrusted another with that which was *prima facie* evidence of title in him, and thus enabled him to deceive the purchaser. But that was never heard of as a ground for estoppel when a bailee wrongfully sells the property of another. On the contrary, the same law which informs the purchaser that possession is *prima facie* evidence of title in the bailee, informs him also that it is only *prima facie*, and that if he buys on the strength of that alone, he buys it at his risk. I can see no reason why the law should not say the same to the purchaser of a non-negotiable chose in action. And I had always supposed it to be well settled that such was the rule, and that such a purchaser could get no better right than his ven-

dor. But if the doctrine of estoppel, as applied by the court to this case, is to be established, I cannot see why it does not overturn this long established rule, and enable a party to purchase *non*-negotiable paper with the same effect that he would negotiable. For suppose Judge Cothren had in this case, instead of this order, given to the Iowa County Bank a non-negotiable note. That would have been a *prima facie* evidence of debt against him as much as though it had been negotiable. He had then entrusted the bank with *prima facie* evidence of a debt against him. Such claims are as much the subject of assignment and sale as is an interest in a particular fund to become due in the future on a contingency. If then the *State Bank* could purchase a supposed interest in such fund, and estop Judge Cothren from showing that such supposed interest was really no interest, on the ground that he had entrusted his agent with a *prima facie* evidence of title, why might it not as well have purchased the supposed claim against him evidenced by the non-negotiable note, and estop him, from showing that there was really no debt upon the same ground? I cannot see why the principle would not extend to such case as well as to the one now presented.

But there has never been held to be an estoppel in such cases, for the reason that the law told the purchaser when he bought, that the evidence on which he relied was only *prima facie*, and therefore liable to be rebutted, so that it was his own folly to buy upon such evidence without further inquiry. It seems to me the same answer is good here. Indeed I can see no reason why the law should then tell him that if he does purchase, relying on such evidence alone, the law will, through the means of an estoppel, convert it into conclusive evidence in his favor. With what injustice can he who was told beforehand that the evidence on which he relied was only *prima facie*, insist afterwards on its being held conclusive?

The case of *Pickering vs. Busk* is much relied on in the opinion of the court. But I understand that case to have been decided on the ground that the facts showed an actual implied authority in the broker to sell the property in dis-

pute. The possession was actually entrusted to the broker, whose business was to sell, and the title was entered in his name in the wharfinger's books, where the owners' names were recorded. I do not care to question the correctness of that decision, for I think its facts were so different from the present case as to make it inapplicable. There the broker's business was to sell, and the judges said it must be implied that the property was sent to him to sell. But banks are as often employed to buy claims as to sell them. No authority to sell could therefore be implied necessarily from the business of the bank. There the actual property itself, as well as the evidence of title, was with the broker, and capable of delivery; while here the fund drawn on was not in the possession of the Iowa County Bank, and not even due to the drawer of the order. The bank had nothing but the order itself, and even if it had authority to sell, it could only sell it for what it was, that is, as *prima facie* an assignment of the fund, but liable to be shown by extrinsic proof to be mere authority.

It seems to me impossible to make it anything more than a purchase of a non-negotiable draft or order, falling within the long settled rules of law applicable to such paper.

The difference between this case and cases falling within the general principle stated by Lord ELLENBOROUGH, that as to the public, the apparent authority is the real authority, is this: In that class of cases the public have a right to rely on the authority of the agent as being absolutely what the evidence submitted to the public would indicate it to be, until notified to the contrary; while in a case like this the law refuses to attach any absolute effect to such an order, but informs all purchasers that it may be one thing or another according to extrinsic facts. There is no hardship in saying that whoever purchases after such information, takes the paper subject to having its real character shown.

Nor can I at all assent to the position in the opinion of the court, that the drawer of such an order, who places it in the hands of his agent to collect the money, is as much estopped by the mere issuing of it in that way, as he would be if, after it was issued, he had been applied to by some one contemplating a purchase, and had informed such person that the

agent was the owner of the fund. The latter would be a clear case of estoppel, but the former is so widely different that it cannot be assimilated to it. A party putting into circulation non-negotiable paper, has a right to do so relying upon the well known rule of law that no purchaser of such paper can get any better rights as against him than the party had to whom he originally gave it. It makes no difference that the paper itself contains *prima facie* evidence of a claim. He still has a right to rely on the rule, and to assume that every purchaser knows such to be the rule. He is not bound, therefore, to attach to such paper a notice of what defenses he has against it, or what are the real rights which it confers as against him, on pain of being estopped from showing such defenses if any body buys, but may justly assume that whoever purchases it, relying upon the paper alone, takes it with that risk. But if after such paper is afloat, some person applies to him to know its true character, and whether it is good for what it purports to be, with a view to purchase, he is then bound by every principle of justice to state the real truth, and if he answered falsely, that the paper was valid for the purposes for which the purchaser wished it, he would be estopped from afterwards denying it. The very object of such a special inquiry would be, to remove the uncertainty as to the value of the paper growing out of the rule making it subject to the equities between the original parties. The party is then bound by his representations as to the fact, the purchaser having relied on them. But to say that the mere creation of the paper and putting it into circulation, was equivalent to a subsequent special representation that the real rights between the original parties were such as the paper would indicate, is a position which I think it impossible to sustain. If the doctrine of estoppel is to be carried to this length, I am unable to see why it does not reduce non-negotiable paper to the same position held by negotiable paper, by preventing the maker from showing the rights of the holder to be at all different from what the paper itself would indicate.

I think the demurrer to the return should be overruled.